## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PENNSYLVANIA INVESTMENT PROPERTIES, II LP, | No. 4:22-CV-00555 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| TRUIST BANK in its own right and as successor to BRANCH BANKING AND TRUST COMPANY (BB&T), | |
| Defendant. | |

## MEMORANDUM OPINION

### APRIL 4, 2025

## I.    BACKGROUND

On April 15, 2022, Plaintiff Pennsylvania Investment Properties, II LP filed a one-count Complaint against Defendant Truist Bank for breach of contract.[1] Pennsylvania Investment Properties, II LP alleges that Truist Bank marketed and sold a property to a third-party in violation of its right of first offer. After the completion of discovery, cross-motions for summary judgment were filed by the parties; these motions are now ripe for disposition. For the reasons that follow, Pennsylvania Investment Properties, II LP's Partial Motion for Summary Judgment

---

[1]    Doc. 1 (Compl.).

as to Liability is denied and Truist Bank's Motion for Summary Judgment is granted in part and denied in part.

## II.    DISCUSSION

### A.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[3] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[4] Conversely, to survive summary judgment, a plaintiff "must point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[5]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[6] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving

---

[2]   FED. R. CIV. P. 56(a).
[3]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).
[4]   *Clark v. Mod. Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993).
[5]   *Id.*
[6]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

party."[7] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[8] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[9]

"This standard does not change when the issue is presented in the context of cross-motions for summary judgment."[10] "When both parties move for summary judgment, 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'"[11]

## B.    The Undisputed facts

### 1.    The Parties

Pennsylvania Investment Properties, II LP ("PIP II") is a Pennsylvania limited partnership that develops real estate.[12] PIP II's general partners are Clapps Management Inc. and P.A.C. Management Inc.[13] and its limited partners are Albert

---

[7]   *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[8]   FED. R. CIV. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[9]   FED. R. CIV. P. 56(c)(3).

[10]  *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987)).

[11]  *Id.* (quoting 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2720 (3d ed. 2016)).

[12]  Doc. 41 (Plaintiff's SMF) ¶ 1.

[13]  Both Clapps Management and P.A.C. Management are Pennsylvania corporations. *Id.* ¶ 2.

A. Clapps and Paul A. Clapps.[14] A merger involving Branch Banking and Trust Company ("BB&T") led to the creation of Truist Bank in 2019.[15] Consequently, Truist Bank is the successor in interest to BB&T.[16]

### 2. The 2016 Sale

In 2016, BB&T owned a bank branch at 2541 East College Avenue, State College, Pennsylvania, the property in dispute in this case ("the Property").[17] BB&T also owned the adjacent property, 2501 East College Avenue, State College, Pennsylvania ("the Adjacent Property").[18] BB&T sold the Adjacent Property to Plaintiff in 2016, which it developed into a Burger King restaurant.[19]

### a. The Relevant Provisions of the 2016 Agreement of Sale of the Adjacent Property

The Agreement for Sale of the Adjacent Property contained a provision that discussed a right of first offer ("ROFO") as to the Property.[20] This provision states:

> Seller shall further grant to Buyer a right of first offer on [2541 East College Avenue, State College, Pennsylvania] (the "Right of First Offer"), to be set forth in more detail in an agreement to be negotiated and agreed upon by the parties during the Study Period, and by which Seller shall agree that in the event the Seller decides to list the Adjacent Property for sale, Seller shall deliver written notice to Buyer and for a period of thirty (30) days after such written notice is delivered, Seller shall not enter into a binding agreement with any third party for the

---

[14]  *Id.* ¶¶ 2-3.
[15]  *Id.* ¶¶ 5-6.
[16]  Doc. 41 (Plaintiff's SMF) ¶ 6; Doc. 38 (Defendant's SMF) ¶ 1.
[17]  Doc. 41 (Plaintiff's SMF) ¶ 9; Doc. 38 (Defendant's SMF) ¶ 4.
[18]  Doc. 41 (Plaintiff's SMF) ¶ 8; Doc. 38 (Defendant's SMF) ¶ 5.
[19]  Doc. 41 (Plaintiff's SMF) ¶¶ 10, 20; Doc. 38 (Defendant's SMF) ¶ 6.
[20]  Doc. 41 (Plaintiff's SMF), Ex. D (Adjacent Property Sale Agreement); Doc. 38 (Defendant's SMF), Ex. C (Adjacent Property Sale Agreement).

purchase of the Adjacent Property, and shall negotiate in good faith with Buyer to agree upon mutually agreeable terms for a purchase contract between Buyer and Seller for the purchase of the Adjacent Property. Such Right of First Offer shall be personal to the Buyer and not assignable, except to a successor entity taking ownership of the Property and majority owned by the general partners of the Buyer as set forth in the signature block of the Contract. If no purchase agreement for the Adjacent Property has been executed between the Buyer and Seller by the end of the thirty (30) day period, then the Right of First Offer shall be deemed terminated and of no further effect. The agreement shall expressly state that the Right of First Offer is not recurring after the expiration of the one 30-day period.[21]

There are two other relevant provisions of the Agreement of Sale of the Adjacent Property. The first is a survival clause which states: "Covenants and agreements contained in this Contract shall be merged in the Special Warranty Deed at Closing and shall not survive the Closing, except that the obligations and/or disclaimers of the parties set forth in Sections 6, 9, 11, 15 and 18 shall survive the Closing indefinitely."[22] Second, the Agreement of Sale of the Adjacent Property provides that "[t]his Contract contains the entire agreement of the parties and there are no representations, inducements or other provisions other than those express herein."[23]

### b. The 2016 Transmittal Letter

On December 28, 2016, BB&T mailed the following documents to PIP II's real estate attorney, Scott Williams, to close on the Adjacent Property: the Limited

---

[21] *Id.* ¶ 33(b).
[22] *Id.* ¶ 21.
[23] *Id.* ¶ 22.

Warranty Deed; a Settlement Statement; the Owner's Affidavit; a Certificate of Non-Foreign Status; the Agreement for Right of First Offer; and the Temporary Construction Easement Agreement.[24] In the accompanying letter, BB&T requested Williams to "hold all Closing Documents in trust until you are in a position to (a) consummate closing in accordance with the terms and conditions of the Contract and this letter, and (b) wire transfer the sum payable to BB&T pursuant to the Settlement Statement approved by BB&T (being $499,658.78) to our firm's trust account."[25] Williams was also directed to return by email "a copy of the fully executed Settlement Statement and Deed (once recorded)."[26]

### 3. The Right of First Offer

The ROFO is dated December 28, 2016; it was signed on behalf of BB&T that same day and on behalf of PIP II on December 29, 2016.[27] The relevant provisions of the ROFO are:

> NOW, THEREFORE, in consideration of One Dollar ($1.00) the receipt and sufficiency of which is hereby acknowledged and intending to be bound hereby and to bind their respective successors and assigns, the parties hereto agree as follows:
>
> If BB&T desires to sell its interest in [the Adjacent Property] (the "Interest") at any time, prior to marketing or accepting any offer to

---

[24]   Doc. 45 (Plaintiff's Answer to Defendant's SMF), Ex. E (Bagley Letter 12/28/2016); Doc. 38 (Defendant's SMF), Ex. L (Bagley Letter 12/28/2016).
[25]   *Id.*
[26]   *Id.*
[27]   Doc. 45 (Plaintiff's Answer to Defendant's SMF), Ex. B (FOFO); Doc. 38 (Defendant's SMF), Ex. S (ROFO).

purchase the Interest BB&T shall give PIP II written notice of its intention to sell the Interest (the "ROFO Notice").

> For a period of thirty (30) days from PIP II's receipt of the ROFO Notice (the "Offer Period") BB&T shall not enter into a binding agreement with any third party for the purchase of the Interest.

> During the Offer Period, the parties shall negotiate in good faith to agree upon mutually acceptable terms for an agreement for sale for PIP II to purchase the Interest.[28]

### 4.    Returning and Recording the 2016 Closing Documents

Before I turn to the next relevant events, I address the relevancy, or lack thereof, of Truist Bank's admissions in its Answer to the Complaint.[29] In relying on these admissions, PIP II contends that Truist Bank has conceded that the ROFO is a binding contract. However, judicial admissions "must be statements of fact that require evidentiary proof, not statements of legal theories."[30] Even if these admissions were broad enough to concede that a binding contract existed,[31] "that concession would not be binding on [Defendant] because it would be a statement of a legal proposition."[32]

---

[28]  Doc. 41 (Plaintiff's SMF), Ex. H (the ROFO); Doc. 38 (Defendant's SMF), Ex. S (the ROFO).

[29]  The relevant portions of the Answer state: "Truist admits only that Plaintiff acquired the ROFO;" "Truist admits only that the parties entered into an Agreement for" the ROFO; "Truist admits only that the parties entered into the ROFO;" and "Truist admits only that Plaintiff obtained the ROFO." Doc. 18 (Answer) ¶¶ 36, 39, 42, 49.

[30]  *Anderson v. Comm'r*, 698 F.3d 160, 167 (3d Cir. 2012).

[31]  Further, I have serious reservations that the statements highlighted by PIP II function to concede that an enforceable contract exists. As Truist Bank notes, these statements did not "admit that Plaintiff returned a signed copy of the ROFO or communicated acceptance or that a valid, enforceable contract was formed." Doc. 48 (Defendant's Reply Brief) at 7.

[32]  *Anderson*, 698 F.3d at 167. The existence of a contract is a legal conclusion. *Toppy v. Passage Bio, Inc.*, 285 A.3d 672, 681-82 (Pa. Super. 2022). *See also Fed Cetera, LLC v. Nat'l Credit*

### a.    Truist Bank's Integrated Workplace Management System

Truist Bank stores "fully executed documents" in an "Integrated Workplace Management System" ("IWMS").[33] Properties are designated in the IWMS by both the property's address and an asset number;[34] documents such as a right of first refusal or a ROFO would be stored in this system.[35] Defendant's typical process for maintaining documents in the IWMS is to have the legal team draft the document, and "once fully executed," to have the legal department send it to Truist Bank's lease administration.[36]

When listing a property for sale, Defendant's "standard" process is to check the IWMS for any relevant agreements, such as a ROFO, right of first offer, or option, first "before [the property] is marketed" and again before entering a contract for sale of the property.[37] But as Truist has "acquired" some of these properties through "many different mergers," Nate Pesenti, a transaction manager in Truist Bank's corporate real estate department, has "no expectation as to what [he]'ll find" when searching the IWMS.[38] That is because these prior banks "have varying

---

Servs., 2023 U.S. Dist. LEXIS 143156, 2023 WL 5274465, at *26 (D.N.J. Aug. 16, 2023) ("However, whether a contract exists is not a "factual assertion" but rather a question of law.").

[33]  Doc. 38 (Defendant's SMF), Ex. A (Pesenti Dep. Transcript) at 16:17-20.
[34]  *Id.* at 37:3-6.
[35]  *Id.* at 22:20-23.
[36]  *Id.* at 48:5-10.
[37]  *Id.* at 32:3-9, 41:6-8.
[38]  *Id.* at 9:18-21, 10:12-14, 46:11-17.

degrees of filing consistency," which means there may be no documents in the database for a specific property.[39]

Pesenti did not know why the ROFO was not present in the IWMS, and he indicated that this absence was not intentional.[40] Consistent with its absence from the IWMS, Pesenti stated he "did not see this document until it was presented" in the present litigation.[41] Pesenti also admitted that Defendant did not search the IWMS for records relating to the Adjacent Property when listing the Property.[42]

## b.    Scott Williams' Testimony

Williams, testified that "standard [closing] practice" is to "have everybody at the same table," but "in cases like this involving attorneys . . . far away," "[t]hey request documents to be returned and we return them."[43] He was "not aware" of whether Plaintiff ever returned a signed copy of the ROFO to BB&T.[44] "[T]o the extent" BB&T "wanted any of" the Closing Documents returned or recorded, Williams "would have sent them" or recorded them.[45] He further indicated that he "[p]robably" would have only returned the documents requested by BB&T[46] and

---

[39]    *Id.* at 46:11-17.
[40]    *Id.* at 45:13-25.
[41]    *Id.* at 44:16-22
[42]    *Id.* at 47:4-8.
[43]    Doc. 38 (Defendant's SMF), Ex. E (Williams Dep. Transcript) at 31:15-25.
[44]    *Id.* at 71:23-72:2. Plaintiff denies this fact as immaterial "as Defendant has already admitted that the parties entered into the ROFO Agreement." Doc. 45 (Plaintiff's Answer to Defendant's SMF) ¶ 14. As this is the sole basis of the denial, I deem this fact admitted for purposes of resolving these motions.
[45]    *Id.* at 32:16-22.
[46]    *Id.* at 34:22.

that despite intending to record the ROFO, it was not sent down "to the register and recorder with the other documents . . . that were recorded."[47]

### 5.    Truist Bank Sells the Property

In 2020, Truist Bank publicly listed the Property for sale with an asking price of $1 million.[48] At that time, two tenants with multi-year leases occupied portions of the Property.[49] PIP II did not receive written notice from Truist Bank before the Property was listed.[50] Truist Bank eventually entered into negotiations with Horizon Federal Credit Union ("Horizon FCU") to sell both the Property and another property in Muncy, Pennsylvania ("the Muncy Property").[51] Horizon FCU and Truist Bank then executed an agreement for the purchase of the Property in July 2020.[52]

---

[47]  *Id.* at 57:22-24.

[48]  Doc. 38 (Defendant's SMF) ¶ 25; Doc. 45 (Plaintiff's Answer to Defendant's SMF) ¶ 25.

[49]  Doc. 38 (Defendant's SMF) ¶ 28; Doc. 45 (Plaintiff's Answer to Defendant's SMF) ¶ 28.

[50]  Doc. 41 (Plaintiff's SMF) ¶ 26; Doc. 47 (Defendant's Answer to Plaintiff's) ¶ 26.

[51]  Doc. 38 (Defendant's SMF) ¶ 38; Doc. 45 (Plaintiff's Answer to Defendant's SMF) ¶ 38. Defendant contends that it conditioned the sale of the Property on the simultaneous purchase of another property for sale in Muncy, Pennsylvania. The record on this fact is rather mixed; therefore, I limit the undisputed facts simply to the fact that Horizon FCU eventually purchased both the Property and the location for sale in Muncy, Pennsylvania. *See* Doc. 38 (Defendant's SMF), Ex. A (Pesenti Dep.) at 102:9-16; Ex. I (Emails re Offers to Purchase); Ex. J (6/30/2020 Email Thread Between Horizon and Truist) and Doc. 45 (Plaintiff's SMF), Ex. F (02/26/2020 Email from J. Howard) and Ex. G (03/19/2020 Email from J. Howard).

[52]  Doc. 41 (Plaintiff's SMF), Ex. E (Purchase of 2541 E. College Ave.).

C.    **Plaintiff's Proposed Expert Reports**

1.    **Marc Mandel's Expert Report**

Marc Mandel was retained "to determine from a leasing perspective the feasible uses for the development" of the Property "with [the] highest economic benefit to the Property owner of such uses from August 2020 through December 2021."[53] Mandel has over eighteen years of experience "in the leasing and sale of commercial real estate."[54]

To aid his analysis, Plaintiff provided Mandel with information about the Property, including its size and position on "Route 26 (East College Avenue), a major local throughfare."[55] As to the surrounding area, Mandel acknowledged that there was "not as much" of the "newer retail" development.[56] While his report ensured that the recommended uses could "theoretically" fit on the Property, he did not evaluate the changes that would need to occur to achieve these uses.[57]

Plaintiff also informed Mandel that the Burger King on the Adjacent Property "is performing at 150% of nationwide average Burger King annual sales."[58] Based on this metric, Mandel concluded the Property "has significant potential as a quick serve or fast-food type restaurant."[59] But Mandel "discarded" the "intended use" of

---

[53]  Doc. 38 (Defendant's SMF), Ex. O (Mandel Report) at 1.
[54]  *Id.*
[55]  *Id.* at 3.
[56]  Doc. 38 (Defendant's SMF), Ex. P (Mandel Dep. Transcript) at 11:15-19.
[57]  *Id.* at 34:17-21.
[58]  Doc. 38 (Defendant's SMF), Ex. O (Mandel Report) at 3.
[59]  *Id.*

a casual dining restaurant "due to what [he] felt would be at best marginal parking capacity of the Property for a casual dining restaurant."[60]

Consequently, Mandel evaluated possible retail uses of the Property under the following "four criteria generally used to determine the highest and best use of a property": (1) "legal permissibility;" (2) "physical possibility;" (3) "financial feasibility" and (4) "maximum productivity (the highest present value)."[61] To do so, Mandel researched net lease transactions between August 2020 and December 2021.[62] He then "summarize[d] [the] relevant sale prices, lease terms, net operating income (NOI), and [capitalization] rates for the identified retailers/uses."[63]

Based on his analysis of this data, Mandel concluded "that the feasible uses for the Property likely to lead to the highest economic returns for the Property owner include:" for single tenants, "Chick-Fil-A; Chipotle; Panera Bread; and a CVS Pharmacy" and for a multiple tenant building: "Starbucks, Aspen Dental, Verizon, Chipotle, T-Mobile, Urgent Cares, etc."[64] After estimating commercial mortgage rates in 2020 and 2021 and typical lease lengths,[65] Mandel identified the "average

---

[60]  *Id.*
[61]  *Id.*
[62]  *Id.* at 3-4.
[63]  *Id.* Capitalization rate "refers to the rate of return, in year one, on a property based on the net operating income of the property." *Id.* This figure "is derived from taking the net operating income and dividing it by the sale price." *Id.*
[64]  *Id.* at 9.
[65]  *Id.*

sale price and cap[italization] rate" for each possible use.[66] These figures are summarized in the table below.

| Business | Lease Length | Lease Type | Average Sale Price | Capitalization Rate |
|---|---|---|---|---|
| Chick-fil-A | 15 – 20 years | Triple net 20-year ground lease | Approximately $3,700,000 | 3.72% |
| Chipotle | 10 – 15 years | Vary from NNN Ground Lease to Fee Simple: NN (Landlord responsible for roof and structure) | Approximately $3,072,000 | 4.62% |
| Panera Bread | 10 to 15 years | Vary from NNN Ground Lease to Fee Simple: NN (Landlord responsible for roof and structure) | Approximately $3,521,000 | 4.87% |
| CVS Pharmacy | 20 years | Fee Simple: NN lease with Landlord responsible for roof and structure | $6,592,000 | 5.02% |
| Multi-Tenant Building | Not Provided | Not Provided | $4,610,758 | 6.23% |

As the tenants Mandel identified in his report offer the highest returns, he agreed with Truist Bank's proposition that they "can command a premium location."[67] Although his report "did not . . . look at if [these tenants] would choose that site or not,"[68] Mandel believed the State College market could accommodate these additional businesses.[69]

---

[66] *Id.* at 10.
[67] Doc. 38 (Defendant's SMF), Ex. P (Mandel Dep. Transcript) at at 43:21-23.
[68] *Id.* at 45:15-16.
[69] *Id.* at 46:20-47:1.

## 2.    Don Shearer's Proposed Expert Report

Don Shearer appraised the Property "to develop credible opinions of the prospective market values of the subject property based on" the five uses identified by Mandel.[70] To perform this analysis, Shearer assumed "that the existing building has been demolished and the site will be redeveloped."[71] He identified the following values for each property, with a mid-range of $4,144,600:

| Business | Prospective Market Value |
|---|---|
| Chick-fil-A | $4,000,000 |
| Chipotle | $4,118,000 |
| CVS | $4,267,000 |
| Panera Bread | $4,042,000 |
| Retail flex | $4,296,000 |

Shearer performed a market analysis "to address . . . whether there is demand for one or more of the prospective property types in the State College market."[72] He concluded these entities would benefit from the presence of the main campus of the Pennsylvania State University and the "growth in population in the Centre Region."[73] As to competition, Shearer noted there are two Chipotles, one Chick-fil-A, three Panera Breads, and seven CVS locations in the State College area.[74] But based on his analysis "of the demographics, market stability, [and] a vibrant economy, there appears to be adequate demand for any of the prospective use types

---

[70]    Doc. 38 (Defendant's SMF), Ex. R (Shearer Report) at 2.

[71]    *Id.* at 17.

[72]    *Id.* at 70.

[73]    *Id.*

[74]    *Id.*

to be absorbed in the State College market."[75] "The accessible location of the subject site in all directions adds to the potential appeal and marketability of a redeveloped subject site . . . ."[76]

As he was unaware of the existing tenants, Shearer assumed that the Property's title was free of encumbrances.[77] When asked how the existence of a lease on the building would change his analysis, Shearer responded that "[i]f there was a 30-year lease on the property, then I wouldn't have been able to do the five potential uses. I had to do it 30 years from now."[78] If it was a five-year lease, he "would have to delay the value for five years."[79] When asked to identify the impact an existing lease has when developing a property, Shearer acknowledged that "sometimes" a buyout of that lease occurs and he has seen incidents where a tenant did not want to give up its interest.[80]

### D.    Analysis

In Pennsylvania, a breach of contract claim "contain[s] three [elements]: '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages."[81]

---

[75]  *Id.*
[76]  *Id.*
[77]  Doc. 38 (Defendant's SMF), Ex. Q (Shearer Dep. Transcript) at 52:25-53:2, 53:23.
[78]  *Id.* at 56:19-22.
[79]  *Id.* at 56:24-57:1.
[80]  *Id.* at 60:16-25.
[81]  *Udodi v. Stern*, 438 F. Supp. 3d 293, 299 (E.D. Pa. 2020) (quoting *Ware v. Rodale Press Inc.*, 322 F.3d 218, 225 (3d Cir. 2003)).

15

### 1.    Acceptance of the ROFO

"It is black letter law that in order to form an enforceable contract, there must be an offer, acceptance, consideration or mutual meeting of the minds."[82] "An enforceable agreement exists if the parties have manifested their intent to be bound by its terms and the terms are sufficiently definite."[83]

"In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter."[84] Section 56 of the Restatement (Second) of Contracts provides that "[e]xcept [for instances where acceptance by silence is sanctioned in Section 69] or where the offer manifests a contrary intention, it is essential to an acceptance by promise either that the offeree exercise reasonable diligence to notify the offeror of acceptance or that the offeror receive the acceptance seasonably."[85] After all, a "secret intent to accept" does not operate as an acceptance.[86]

It is undisputed that the ROFO did not appear in Truist Bank's IWMS. Defendant correctly argues that this suggests PIP II failed to return the ROFO to BB&T back in 2016. This inference finds further support in Scott Williams' comments that he would have returned only documents requested by BB&T, namely

---

[82]  *Jenkins v. Cty. of Schuylkill*, 658 A.2d 380, 383 (Pa. Super. Ct. 1995) (citing *Schreiber v. Olan Mills*, 627 A.2d 806, 808 (Pa. Super. Ct. 1993)).

[83]  *Beaver Dam Outdoors Club v. Hazleton City Auth.*, 944 A.2d 97, 103 n.2 (Pa. Cmmw. Ct. 2008) (citing *In re Estate of Hall*, 731 A.2d 617 (Pa. Super. Ct. 1999)).

[84]  *Espenshade v. Espenshade*, 729 A.2d 1239, 1243 (Pa. Super. 1999).

[85]  Restatement (2d) of Contracts § 56 (1981).

[86]  *Makoroff v. Dep't of Transp.*, 938 A.2d 470, 472 (Pa. Commw. Ct. 2007).

the recorded deed and executed settlement statement.[87] When combined, these inferences operate to establish a genuine dispute of fact as to whether Plaintiff communicated its acceptance of the ROFO negotiated during the Adjacent Property's study period to BB&T.[88]

But Nate Pesenti's comments on the IWMS create sufficient disputes of fact such that I cannot grant summary judgment on this basis to Truist Bank either. Pesenti could not explain why the ROFO was missing in the IWMS beyond indicating that it was not intentional.[89] When taking all inferences in Plaintiff's favor, a reasonable juror could conclude that the absence of the ROFO was due to insufficient recordkeeping by the bank. Pesenti specifically testified to the "varying degrees of filing consistency" the prior banks subsumed by Defendant had.[90] Truist Bank's failure to search the database for the Adjacent Property further undercuts its case for summary judgment on this issue.[91] Accordingly, I also deny Truist Bank's motion for summary judgment on this basis.

---

[87]    Doc. 45 (Plaintiff's Answer to Defendant's SMF), Ex. E (Bagley Letter 12/28/2016); Doc. 38 (Defendant's SMF), Ex. L (Bagley Letter 12/28/2016).

[88]    Given this conclusion, I need not address Truist Bank's argument in opposition to Plaintiff's summary judgment motion as to the adequacy of consideration in this case.

[89]    Doc. 41 (Plaintiff's SMF), Ex. B (Pesenti Dep. Transcript) at 45:24-25.

[90]    *Id.* at 46:11-17.

[91]    *Id.* at 47:4-8. As there is a genuine dispute as to whether the ROFO was returned to BB&T in 2016, I need not address Defendant's argument concerning the mitigation of damages by recording the ROFO.

## 2.    Meeting the Terms Horizon FCU Agreed To

Truist Bank next contends that the record before the Court demonstrates that PIP II could not have met the terms it required to purchase the Property. To make this argument, Defendant points to two aspects of the record: (1) Truist's requirement for the purchaser to assume the existing leases at the Property and (2) PIP II was purportedly uninterested in purchasing its Muncy Property. The Court cannot grant summary judgment on either basis.

Rather than serving as a bar to PIP II's willingness to contract, the issue of the existing leases more accurately goes to the existence of damages.[92] As to the Muncy Property, there is a mixed record as to whether Truist Bank conditioned Horizon FCU's purchase of the Property on the sale of the Muncy Property. Although aspects of the record support this narrative, Plaintiff has introduced emails that suggest Horizon FCU was merely interested in that property as well.[93] This proposition finds

---

[92]    While Paul Clapps indicated he would want to know the terms of the leases before purchasing the Property, he also highlighted the positive benefits having existing tenants would have provided. Doc. 38 (Defendant's SMF), Ex. D (Paul Clapps Dep. Transcript) at 91:8-11, 92:19-20. Given these facts, I conclude there is a sufficient dispute of fact that it cannot be said that PIP II would not have purchased the Property despite the existing tenants.

[93]    *See* Doc. 38 (Defendant's SMF), Ex. A (Pesenti Dep.) at 102:9-16; Ex. I (Emails re Offers to Purchase); Ex. J (6/30/2020 Email Thread Between Horizon and Truist) and Doc. 45 (Plaintiff's SMF), Ex. F (02/26/2020 Email from J. Howard) and Ex. G (03/19/2020 Email from J. Howard). Defendant is correct that a ROFO does not require it to pass up on a more beneficial deal, but it is wrong to contend that this dispute is irrelevant to the summary judgment analysis given PIP II's stated willingness to pay for the full asking price of the Property. Doc. 38 (Defendant's SMF), Ex. D (Paul Clapps Dep. Transcript) at 95:13-16.

further support in PIP II's own experience with BB&T when purchasing the Adjacent Property.[94]

### 3.    Speculative Damages

"[I]n the law of contracts[,] remedies for breach are designed to protect either a party's expectation interest by attempting to put him in as good a position as he would have been had the contract been performed, that is, had there been no breach; his reliance interest by attempting to put him back in the position in which he would have been had the contract not been made; or his restitution interest [by requiring] the other party to disgorge the benefit he has received by returning it to the party who conferred it."[95]

"As a general rule, damages are not recoverable if they are too speculative, vague or contingent and are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."[96] "Under Pennsylvania law, the evidence must afford a reasonable basis to support an award of damages; a verdict cannot be based upon mere speculation or guesswork."[97] But "[t]he law makes a distinction . . . between the existence of damages and the amount

---

[94]  Doc. 38 (Defendant's SMF), Ex. D (Paul Clapps Dep. Transcript) at 85:22-86:6.
[95]  *Trosky v. Civ. Serv. Comm'n*, 652 A.2d 813, 817 (Pa. 1995).
[96]  *Spang & Co. v. U.S. Steel Corp.*, 545 A.2d 861, 866 (Pa. 1988).
[97]  *Arconic Corp. v. Novelis Inc.*, No. 17-1434, 2022 U.S. Dist. LEXIS 209258, at *14 (W.D. Pa. Nov. 18, 2022) (*Helpin v. Trustees of Univ. of Pa.*, 10 A.3d 267, 270 (Pa. 2010)).

of damages."[98] "If the uncertainty concerns only the amount of damages, summary judgment is inappropriate."[99]

To support its claim for damages, Plaintiff retained two experts. Marc Mandel identified the "feasible uses for the" Property with "the highest economic benefit" for the owner.[100] Don Shearer then appraised the property under these use conditions, leading him to develop a prospective market value of between $4,000,000 and $4,296,000.[101]

But this claim of loss is based on a completely unsupported assumption: that these national tenants would take up residence in a redeveloped version of the Property.[102] Neither expert evaluated the likelihood of the proposed tenants moving into the Property,[103] although Shearer did indicate the market would be large enough to accommodate their presence.[104] PIP II has had no discussions with potential tenants or franchisees about building plans, approvals, or financial terms.[105] In fact,

---

[98] *Id.* at *15 (citing *Wachovia Bank N.A. v. Feretti*, 935 A.2d 565, 572 (Pa. Super. Ct. 2007)).

[99] *Aircraft Guar. Corp. v. Strato-Lift, Inc.*, 991 F. Supp. 735, 740 (E.D. Pa. 1998).

[100] Doc. 38 (Defendant's SMF), Ex. O (Mandel Report) at 1.

[101] *Id.*, Ex. R (Shearer Report) at 71.

[102] I note that Plaintiff contends that maintaining the existing leases would be consistent with the valuation of a multiple tenant building, as identified by Mandel and Shearer. However, the evidence provided by Plaintiff's experts does not align with this argument. Mandel specifically evaluated the presence of national tenants and indicated "no developer is going to build a restaurant, you know, just for a . . . no credit kind of personal operator." Doc. 38 (Defendant's SMF), Ex. P (Mandel Dep. Transcript) at 31:25-32:2. Shearer's expert report similarly primarily relied upon multiple-tenant buildings with national tenants. Doc. 38 (Defendant's SMF), Ex. R (Shearer Report) at 50-54.

[103] Doc. 38, Ex. P (Mandel Dep. Transcript) at 34:13-21, Ex. Q (Shearer Dep. Transcript) at 33:21-34:23.

[104] Doc. 38 (Defendant's SMF), Ex. R (Shearer Report) at 70.

[105] Doc. 38 (Defendant's SMF), Ex. D (Paul Clapps Dep. Transcript) at 93:15-94:4.

when asked if PIP II was "planning to demolish the existing bank building," Paul Clapps responded that he did not know as "[y]ou wouldn't know until you got into your negotiation what the potential was for development. Maybe we would keep the existing tenants. That property was a bargain."[106] Albert Clapps also confirmed that PIP II's use of the Property, whether that be immediate development or holding it, would have "depend[ed] on market conditions at that point in time."[107] When asked if PIP II would have "sat on" the Property or developed it, Albert Clapps further asserted "[i]t's all conjecture . . . something could come right along and it could have been developed . . . And then you're taking market conditions, interest rates, everything that's going on in the economy."[108]

The Property also had existing tenants, rendering the existence of PIP II's claimed damages even more speculative. When asked how PIP II would have developed the Property despite the existing tenants, Paul Clapps clarified that "[f]irst, you would go out and feel the market out for what is possibly available to work in that property. At the same time, you would be open[ing] the door for negotiation with your [existing] tenants."[109] He did admit to not knowing the terms of the leases of the existing tenants and said he "probably" would want to know that

---

[106] *Id.* at 94:8-16.
[107] Doc. 38 (Defendant's SMF), Ex. F (Albert Clapps Dep. Transcript) at 110:3-10.
[108] *Id.* at 111:19-25.
[109] Doc. 38 (Defendant's SMF), Ex. D (Paul Clapps Dep. Transcript) at 91:18-92:4.

21

information before purchasing a property.[110] He further acknowledged that maintaining the existing tenants would create an ongoing revenue stream that would allow PIP II to simply hold the Property.[111]

Under these circumstances, it is not merely the amount of damages claimed by PIP II that is speculative, it is the existence of the damages itself. PIP II's entire theory of damages hinges on actions of two sets of independent parties: the existing tenants of the Property and the future franchisee. Accordingly, I find it appropriate to limit PIP II's recovery for breach of contract to nominal damages.[112]

## III.    CONCLUSION

Due to the existence of genuine disputes of material facts, Plaintiff's Partial Motion for Summary Judgment is denied; while the Court similarly denies Defendant's Motion for Summary Judgment as to the issue of liability, I will grant Truist Bank's alternative requested relief. PIP II's claim for damages from the alleged breach of contract is accordingly limited to nominal damages.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[110] *Id.* at 93:11-20.
[111] *Id.* at 91:8-11, 92:19-20.
[112] *Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 709 F.3d 487, 497-98 (3d Cir. 2015) ("Under Pennsylvania law, if a party is able to prove breach of contract but can show no damages flowing from the breach, the party is entitled to recover nominal damages.").